# Sankey's Executors *versus* First National Bank of Mifflinburg.

1. Government bonds were deposited in a bank; the depositor alleged that the bank bought them from him at par, fraudulently informing him that there was no premium on them, when there was, within the knowledge of the bank. The depositor sued the bank for the premium and declared in the common money counts. *Held*, that the depositor could not recover on those counts.

2. If the bonds were purchased by the bank in good faith at par, although they were then selling in the market at a premium, of which both parties were ignorant, the depositor could not, on the ground of mutual mistake, recover the bonds or the premium on them.

3. The mistake or ignorance of the parties as to the premium was not of the essence of the contract, and did not avoid the sale.

January 26th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Union county:* Of July Term 1873, No. 73.

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

This was an action of assumpsit, brought August 25th 1869, by Jacob Sankey and others, executors, &c., of John Sankey, deceased, against The First National Bank of Mifflinburg.  The claim was that the plaintiffs' testator, and the plaintiffs after his death on account of the estate, had deposited with the defendants, United States 7–30 bonds, the whole amounting to $6800 ; that when one of the executors called on the cashier for delivery of the bonds, the cashier induced him to receive a certificate of deposit from the bank for the par value of the bonds, although they were, at that time, selling in the market at a premium of 6 or 7 per cent., of which the executor was ignorant, and that the cashier at the time, informed him that those bonds were not at a premium, although he knew that they were.  One of the bonds was for $500.  The declaration was in the common counts only.

The case was tried May 22d 1873, before Junkin, P. J., of the Forty-first District.

Jacob Sankey, one of the plaintiffs, testified to the deposit of the bonds ; that on the 19th of August 1867, witness went to the bank and asked the cashier for the bonds, to use in the Orphans' Court of Centre county, in answer to a citation.  The cashier said he had shipped the bonds, he did not say where, and had no return ; he said he could do nothing but give the executors a certificate of deposit ; that they must have something to show ; witness asked the cashier if there was not a premium on the bonds ; the cashier said there was not.  The witness thought he could do no better than take the certificate of deposit.  "I was not selling, nor intending to sell them, by taking a certificate of deposit ; he drew the certificate and wrote something in his book—I did not know what it was— and asked me to sign it."  Before signing, witness said to the cashier, if there was any premium it belonged to the estate and the executors wanted it.  His answer was that he did not know that there was any premium on them.  "Then I signed my name below the entry on the book ; I mailed the certificate to The First National Bank of Bellefonte. * * * I got the certificate and went to defendants' bank and demanded these bonds from the cashier, and he said the president had expressed them that week. * * * I demanded the bonds that day, but did not get them. * * * I gave up the bonds when I got the certificate."

The plaintiff gave evidence that in August 1867, the bonds were worth $106 to $106.50.

For the defendants, J. W. Sands, cashier of the defendants, testified, that on the 19th of August 1867, the bonds were sold to the bank by Jacob Sankey, one of the executors.  "He wanted the bonds, and I said he could have them, and then he wanted the money, and as I was about to unlock the safe, he said, 'Can't you arrange this matter with the Bellefonte Bank ?' that he did not feel secure in carrying that amount through 'the Narrows.'  I told

28 P. F. Smith—4

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

him I could give him a draft, for which I would charge him the exchange; he did not seem willing to pay exchange, as he said he wanted to deposit the money in the bank at Bellefonte. I then gave him a certificate of deposit, which I said would answer his purpose same as the money. He then gave me the receipt, which he held, showing bonds in our possession. I took this receipt upon the book, where the bonds were entered; viz. : ' Received, August 19th 1867, these bonds $6800 7–30. Jacob Sankey, one of the executors.'

" He offered the bonds for sale and sold them; nothing said about premium that I recollect. Once, previously to this transaction, I spoke to one of the executors, Mr. Reighard, and I then told him that it was time to have those bonds sent in to the government for conversion into 5–20s, as after the 15th of · August 1867, they would not be convertible according to the notice; they were then due and all that were held to that date and after would be paid at par. *   *   *   * Sometime after that, Mr. Reighard came in, and he exhibited a letter and said that Jacob did not wish the bonds converted; that he wanted them to run to maturity and then have them paid in money, and gave reasons, that there was a dowry to remain in the farm, and he wished to handle this money. *  *  * These bonds were actually in the custody of the bank on the 19th of August 1867. I did not tell Sankey that the bonds were shipped. There was no condition attached to the sale of these bonds. These bonds were, with the exception of one $500, of the first series of 7–30s, and fell due 15th of August 1867. They were redeeming these bonds at par after 15th of August 1867. I had no other information on 19th of August 1867, than that the government was paying them at par. Our bank is located at Mifflinburg, Union county, about ten miles from telegraph and railroad. On the night of 20th of August 1867, when the Philadelphia mail came, found that the government had extended the time thirty days for the conversion of these bonds. I did not tell Jacob Sankey, for I did not then know that the government had extended the time of conversion, and I did not tell him that there was a premium on these bonds, because I did not know there was. The bank paid the certificate of deposit. These bonds were converted into 5–20 bonds by the bank, and were returned to bank on 12th of September 1867, except the $500 bond. The time for conversion was extended on the 13th of August, and I got the paper containing it on the night of the 20th of August 1867. The $500 bond of the third series had a premium. Jacob Sankey was there some time before he sold the bonds. When Jacob Sankey came back on 22d or 23d of August, he told me, or may have said to me, that the bonds were worth 6 or 6½ premium; that he had been told so, and he demanded the premium. I told him that the bank had purchased the bonds and would keep them."

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

The following are points of the plaintiffs, and their answers:—

2. The executors had no right to sell the 7-30 United States bonds deposited in said bank, under their value, including the premium, and if defendant, by its officers, induced plaintiffs to part with them below their value, then plaintiffs can recover the difference.

Answer. The executors could sell these bonds if they chose to do so, and if they parted with them under their market value, under circumstances which shows no gross negligence on their part, but on the contrary good faith, and under the honest belief that there was no premium on them, they would not be liable to account to the estate for the premium. And unless the bank induced them to part with the bonds under their value, by false representation, the plaintiff cannot recover, as we have fully explained in the general charge, unless it should be for the premium on the $500 bond not due until 1868, as we will explain to you in the answer to the fifth point.

3. If plaintiffs and defendant were both mistaken as to the value of said bonds, not knowing at the time that the same were worth six and seven and one half premium, when they were actually worth that, then it was a mutual mistake, and any sale made under such circumstances does not prevent plaintiffs from recovering the balance of their value.

Answer. The mere fact that both Sands and the executor were honestly mistaken in the premium value of these bonds, does not of itself avoid the sale of the bonds to defendant, because, as to the intrinsic face value of the bonds, as to all they called for, and as to all the government had promised to pay, the plaintiffs did get their value. The fact that there attached to these 7–30s a premium value, created by outsiders, in the purchase and sale of these securities, which was not constant nor uniform in the market, and which not only changed up and down, from day to day, but even from hour to hour (a value often trembling in the whirl of a monetary crisis, like a chip in a cyclone), must be considered as so uncertain, as to be insufficient to avoid or rescind a contract because of the misapprehension of this value by the contracting parties. It is so much a parasite, that the supporting trunk knows nothing of it, and to hold the sale void for such a reason would render their sale impossible; for, however trifling the mistake might be, the principle would be the same. It also must be mutual, bind vendor as well as vendee, and could it be pretended in this case, that if the bank had allowed too much premium, that it could have recovered back? Sankey's and Sands' means of information were the same, and the moment they commenced bargaining for the sale and purchase of the bonds, the trust was broken up and the parties dealt at arms' length. Therefore we answer this point in this qualified way, and refer you to the general charge.

4. The cashier called by defendant proves that a few days after

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

the alleged sale, Jacob Sankey, one of the executors, called at the bank, and demanded the bonds or premium, and that the bank then still had the bonds in controversy in possession undisposed of, and it was the duty of the bank to deliver up the bonds on repayment, or at least pay the premium thereon, and not having done so, plaintiffs are entitled to recover the premium, which is proven to be not less than six or seven and one half to the dollar.

Answer. If this was an absolute sale, as sworn to by Mr. Sands, the bank was not bound to return the bonds nor pay the premium, and all this we have fully explained in the general charge.

5. There is no pretence that the bank officers were not aware that the $500 bond of third series was not worth a premium at the time of giving the certificate of deposit; and besides, J. W. Sands, the cashier, swore that he knew there was a premium on bonds not matured.

Answer. If Sands told Sankey that there was no premium on any of the bonds, when in fact there was a premium on the $500 bond, then you should find this premium (which would be about $40) for the plaintiffs.

6. Under the evidence plaintiffs are entitled to recover.

Answer. We cannot take the case from you, and whether the plaintiffs are entitled to recover depends upon the facts found, as explained in the general charge.

The court charged:— * * *

" If the witness, Mr. Sands, is believed, there was a sale of these bonds to the defendant, and the only difference there is between the statements of the cashier and the executor, is in reference to representations made by the cashier; that is, the latter denies that he told the former that the bonds were shipped, and that he told him in addition that there was no premium on them. The testimony of the cashier is supported by all the written papers which were executed at the time, to wit, the receipt, and the certificate of deposit, which indicate an unconditional sale. Then, if Mr. Sands is believed, the only remaining question is, did he fraudulently conceal from the executor any fact touching the value of these bonds, which good faith and fair dealing required him to disclose? Had Sands, the cashier, any knowledge, bearing upon the market value of these bonds, which was not known to the executor, and which he fraudulently withheld from him? As a general rule, a vendee about to purchase a chattel from another, is not bound to impart to the vendor any knowledge which he may possess—that the article has advanced in price—but on the contrary he may keep silence, and it is only when he *speaks*, that he is held to the truth of what he chooses to say. His silence cannot misrepresent. Then, did this cashier say to this executor, that there was no premium on these 7–30 United States bonds, and thus induce the latter to sell at par? Now if he did, and *knew* at the time that this was *false*,

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

that, in point of fact, the bonds were commanding in the market a premium of from six to seven and one half per cent., then he was guilty of fraudulent misrepresentation, and the plaintiff may recover the difference between the par value and the market value of these bonds on the 19th of August 1867." * * * [Now, we say to you, that if you find the facts to be, that on the 19th of August 1867, when the bank purchased these bonds, it was not known to their cashier, who did the business for the bank, that the government had, by its order of the 13th of August 1867, extended the time for the conversion of the overdue 7–30s into 5–20s, then these plaintiffs cannot recover], because no concealment of a fact could be possible on the part of the cashier, when he had no knowledge that such a fact existed; a man can neither conceal nor disclose what he does not know. To hold that any sudden rise or fall in the market value of an article of traffic, unknown to the vendor and vendee, would render void a sale, would arrest all buying and selling, and the business of the world would stand still, litigation become universal, and trade impossible; therefore, we say to you that, viewing this as a sale of the bonds by the executor to the bank, [the mere fact that at the time of the sale (19th of August 1867), it was known in the centres of trade that the time for the conversion of 7–30s into 5–20s had been extended thirty days, thereby bringing these bonds from par to six or seven per centum premium, but which fact was unknown to the cashier of this bank, does not, in law, make the bank liable to pay the premium in this action], and you should find for the defendant, unless you find under the evidence, that when the executor, on the 19th of August 1867, called upon the former for the bonds, Mr. Sands told him that the bonds were not there, but had been shipped; because, if Sands thus represented that the bonds were shipped, when in fact they were in the custody of the bank, this would be such a fraudulent misrepresentation as would make the bank liable to pay the uttermost farthing of the value of the bonds to these plaintiffs. But did he do this? * * * Even should you find that the cashier told Sankey, the executor, that there was no premium on the bonds, and told him this because he believed it, this would not entitle the plaintiff to recover, because, although it was untrue in point of fact, still it was not fraudulently false, but only unintentionally and mistakenly so; so that the only false and fraudulent representation which could affect the bank, would be as we before stated, the cashier telling the executor that he had shipped the bonds when in fact they were still in the custody of the bank. But do you believe that Mr. Sands ever said so, without motive of any kind to induce him thus to misrepresent?"

The verdict was for the plaintiff for $47.

The plaintiff took a writ of error, and assigned for error, the answers to their points and the parts of the charge in brackets.

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

*G. F. Miller,* for plaintiff in error.—The receipt signed by but one executor is no bar: Hamsher *v.* Kline, 7 P. F. Smith 398. A contract made in mutual mistake is voidable: Miles *v.* Stevens, 3 Barr 21; Bishop *v.* Reed, 3 W. & S. 265; Watts v. Cummins, 9 P. F. Smith 84.

*J. M. Linn* for defendant in error.—The mistake must be of the essence of the contract: Miles *v.* Stevens, 3 Barr 21. The premium here was adventitious. One purchasing goods is not bound to answer as to the state of tne market: Blydenburgh *v.* Welsh, Baldwin 331; Laidlaw *v.* Organ, 2 Wheaton 178; Harris *v.* Tyson, 12 Harris 359. There was no relation of trust obliging the bank to speak: Kintzing *v.* McElrath, 5 Barr 469. The executor had the right to sell: Whale *v.* Booth, 4 Term R. 465; Redfield on Wills, Part II. 219.

Mr. Justice WILLIAMS delivered the opinion of the court, October 14th 1875.

This was an action of assumpsit to recover the premium on certain United States bonds or certificates belonging to the plaintiffs' testator. The declaration contains only the common counts for goods sold and delivered, and for work done, &c. Upon the evidence given by the plaintiffs, and their theory of the case, they were not entitled to recover under any count in the declaration. They denied that they had sold the bonds to the bank, in which they were deposited for safe keeping, but alleged that they had been induced, by the false and fraudulent representations of the cashier, that the bonds had been shipped, and that there was no premium on them, to accept a certificate of deposit for the amount due on their face with the accrued interest; and that having learned within a day or two thereafter that the bonds were selling at a premium of six to six and a-half per cent., they took the certificate to the bank and demanded the bonds, but the cashier refused to deliver them or pay the premium. It was denied, on the part of the bank, that the plaintiffs had been induced to accept the certificate of deposit in lieu of the bonds by any false and fraudulent representations of the cashier; but it was alleged, and the testimony of the cashier, if believed, showed that he had purchased them of the plaintiffs for the bank in good faith for the amount due on their face, with the accrued interest, not knowing that the government had extended the time for their conversion, and that in consequence thereof they were selling at a premium; and that instead of paying Jacob Sankey, the executor from whom the purchase was made, the money therefor, he had given him the certificate of deposit, which was afterwards paid by the bank, because he said that it would answer his purpose the same as money, and he did not feel safe in carrying that

[Sankey's Ex'rs *v.* First Nat. Bank of Mifflinburg.]

amount of money through "the Narrows." The court instructed the jury, in substance, that if the plaintiffs had been induced by the false representations of the cashier to accept the certificate of deposit in lieu of the bonds, they were entitled to recover the premium for which like bonds were then selling, but that if the cashier had purchased them for the bank in good faith, not knowing that the time for their conversion had been extended, and that they were selling for a premium, the plaintiffs were not entitled to recover. The finding of the jury, under the instructions of the court, establishes the fact that the bonds were sold by the plaintiffs and purchased by the cashier in good faith, and that the latter was not guilty of any fraud or unfair dealing in making the purchase. The plaintiffs now contend—and it is the only point in the case, if such it can be called—that if there was a mutual mistake by both parties in reference to the premium on the bonds, which was discovered before either was in any way prejudiced, that the plaintiffs were bound to deliver up the bonds on demand or pay the premium; and that the court erred in not so instructing the jury in answer to their fourth point. But if there was no fraud in the sale of the bonds, it needs no argument to show that this is not the law. If the bonds were purchased, in good faith, for the amount due on their face, the sale cannot be regarded as invalid, because bonds of the same issue were selling at a premium in New York and Philadelphia, and had a speculative value unknown to the parties. If this were the rule there would be no certainty in the sale of government and other securities, unless sold at the stock boards, or in the money markets of the great centres of trade. The mistake or ignorance of the parties in regard to the premium was not of the essence of the contract, or its procuring cause; and if so, it did not avoid the sale. The only error that we discover in the trial of the case, was in instructing the jury that there could be any recovery under the pleadings and evidence, and in allowing the plaintiffs to recover the premium on the bond that was not due and convertible, but of this they do not complain.

Judgment affirmed.